**AFFIRMED and Opinion Filed March 3, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00817-CV

**ANUBIS PICTURES, LLC AND CMA FILMS, LLC, Appellants**
**V.**
**LAUREN SELIG, SHAKE & BAKE PRODUCTIONS,**
**STEPHEN LANNING, AND PHILIP HOBBS, Appellees**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-17579**

## MEMORANDUM OPINION
Before Justices Pedersen, III, and Reichek[1]
Opinion by Justice Reichek

Anubis Pictures, LLC and CMA Films, LLC (collectively "Anubis") appeal

two summary judgments dismissing Anubis's claims against Lauren Selig and Shake

& Bake Productions (collectively "Selig"). Additionally, Anubis appeals the trial

court's order granting the special appearances of Stephen Lanning and Philip Hobbs.

In two issues, Anubis generally contends there were fact issues precluding summary

---

[1] The Honorable Bill Whitehill, Justice, participated in the oral argument and submission of this case, but not the issuance of the opinion, which occurred after the expiration of his term on December 31, 2020. *See* TEX. R. APP. P. 41.1(b) ("After argument, if for any reason a member of the panel cannot participate in deciding a case, the case may be decided by the two remaining justices.").

judgment in favor of Selig and the trial court had specific jurisdiction over both Lanning and Hobbs based on their actions as agents for Philco Films, Ltd. ("Philco"), a company based in London, England. Selig filed a cross-appeal asserting the trial court erred in denying her motion for sanctions against Anubis and its counsel. For the reasons that follow, we affirm the trial court's judgments and orders.

## Background

The actions giving rise to this lawsuit involve the financing of a film based on a screenplay entitled "Downslope" written by the late Stanley Kubrick. In 2009, the Kubrick estate granted authorization to develop and produce the screenplay to Philco, Lanning, and Hobbs. Hobbs, who was Kubrick's son-in-law and a director of Philco, lives in London. Lanning, who resides in Spain, worked with Hobbs during the relevant time period.

In October 2013, Philco entered into an agreement with five individuals, collectively referred to as the SCVTA Group, to secure a portion of the financing for the production of Downslope. The members of SCTVA agreed to obtain financing for roughly half the anticipated cost of production in exchange for various finder's fees, production credits, and participation points.

Shortly thereafter, SCTVA reached out to Anubis, a Texas-based company, to see if it wanted to invest in the film stating it would be "a great in-roads project" for the company to "become players in Hollywood." Anubis responded with a letter stating that it would engage in "due diligence and further investigation" with respect

to arranging financing for Downslope. The letter contemplated that SCTVA would be the borrower of the funds and a term sheet would be forthcoming. It further stated that "[t]his letter and the Term Sheet impose no liability or obligation on Anubis in any way." The record contains no indication that a loan to SCTVA was ever pursued.

In November 2013, Jacob Cohen, one of Anubis's principals, was introduced to Selig, a partner in Shake & Bake Productions, in connection with a different project. Following a phone conversation between Cohen and Selig, Cohen sent Selig an email enclosing a non-disclosure agreement ("NDA"). The email stated that, once the agreement was executed, Cohen wanted to share a film opportunity with Selig that included Chris Pine and Anna Kendrick. The recital portion of the NDA stated,

> Anubis is in the business of financing, developing, creating, distributing, and publishing visual content for television, film, video games, internet, on-line, mobile, and other forms of distribution. [Selig] is a potential financial/creative partner and the parties desire to discuss the potential for Anubis to collaborate with [Selig] in connection with the aforementioned project(s) (the "Discussions") and to provide for the confidentiality of the Discussions and the information relayed during such Discussions.

The NDA further stated that the parties to the agreement would not use any confidential information received from the other party "except for the sole purpose of participating in the Discussions."

To be covered under the terms of the NDA, confidential information disclosed in written form was required to be marked confidential on its face. Any oral

statement intended to be confidential had to be clearly designated as such by the disclosing party. In addition, confidential information was defined by the NDA to exclude, among other things, (1) information that had become publicly known through no wrongful act of the receiving party, (2) information rightfully received by the receiving party from a third party without restrictions on disclosure and without breach of the agreement, (3) information approved for release by written authorization of the disclosing party, and (4) information furnished by the disclosing party to a third party without a similar restriction on disclosure.

The NDA specifically stated that neither Anubis nor Selig was obligated to enter into a transactional contract. In a provision entitled "No Obligation to Complete Transaction," the parties agreed,

> Neither party is bound to proceed with any transaction between the parties unless and until both parties sign a formal, written agreement setting forth the terms of such transaction. At any time prior to the completion of such a formal, written agreement, either party may terminate the Discussions and refuse to enter into any subsequent transaction, for any reason or for no reason, without liability for such termination, even if the other performed work or incurred expenses related to a potential transaction in anticipation that the parties would enter into a formal, written agreement regarding such transaction.

In a section entitled "Governing Law," the NDA provided the agreement would be governed by the laws of the State of Texas and any action arising out of or relating to the agreement must be brought in Dallas County. The agreement concluded with the statement that "[n]o waiver or modification of any of the provisions of this Agreement shall be valid unless in writing and signed by both parties."

–4–

After Selig signed the NDA, Cohen emailed her a copy of a script for a film called "Mantivities" which he stated would star Pine and Kendrick. Cohen asked Selig to let him know when she had time to discuss financing for the Mantivities project, but, after some discussion, Selig decided not to participate.

During this time period, Anubis had begun communicating directly with Philco about the Downslope project. On December 2, Lanning emailed the members of SCTVA to let them know that Philco had decided all further negotiations would involve only Philco and Anubis. Lanning emailed Anubis the same day with points to address in preparation for signing a letter of intent between Anubis and Philco. Among the points to be addressed in the negotiations was whether Downslope would be filmed in Texas. Lanning stated Philco needed creative input and "confirmation by the director that Dallas will work as scripted, scheduled, and budgeted."

In January 2014, while the letter of intent between Anubis and Philco was being negotiated, a team from Anubis met with Selig to discuss several potential projects, including Downslope. On January 10, an Anubis representative, Johnathan Brownlee, emailed Selig a link to a copy of the Downslope script. Neither the email nor the script was marked as confidential. Selig responded to Brownlee a few minutes later asking, "You own it outright?" Brownlee responded, "We have an executed exclusive to finance for Philco." Brownlee went on to state that the director of the film, Jay Russell, had spoken with Joaquin Phoenix and Matt Damon and he requested that Selig not forward the script. In an email sent a few hours later,

Brownlee told Selig the budget for the movie was approximately $20 million and, although it was originally budgeted to be shot in Romania, it was now going to be shot in Texas. Neither email was marked confidential.

Two and a half weeks later, on the morning of January 27, Brownlee emailed Selig again, asking if she was interested in discussing the "Kubrick deal." Over the next several hours, Selig and Brownlee exchanged emails regarding issues such as sales estimates and producers. None of the emails was marked as being confidential or containing confidential information. Selig then asked Brownlee whether Anubis had shown the Downslope project to anyone else and she stated she had "deep relationships with Film Nation, Exclusive, and Voltage." Brownlee responded they had not yet shown the project to anyone because Anubis wanted to solidify its financing partners first. Brownlee went on to state, "If you are interested, let us know. We can put together an LOI subject to budget, sales estimates . . . etc. and then take it to the market together."

While Brownlee was in discussions with Selig, Cohen was continuing negotiations with Philco. Cohen emailed Lanning a letter of intent for Anubis and Philco "to enter into a more formal Production Financing Agreement." In the letter, Anubis stated it was committed to funding up to half of the total budget for the production of Downslope in exchange for various production credits, approval rights, and fees. Anubis also specified that Downslope would be shot in Texas and based in Dallas. The letter concluded, "If the proposed terms are acceptable to you,

please sign below and we will incorporate these terms into the Agreement in which both parties shall commence to negotiate and draft in good faith, provided, however, that until the Agreement is executed, the proposed terms of this letter shall be in full force and effect." Later that day, Lanning emailed the members of SCVTA stating Philco had "agreed and signed our LOI with Anubis. Many thanks for making the introduction possible."

Half an hour after Cohen sent Lanning the Philco letter of intent, Brownlee emailed Selig a substantially similar letter stating, "If this works for you, please execute and return and we can move forward." Brownlee testified the letter was based on discussions with Selig and memorialized the terms to which Selig had agreed. The terms set out in the Selig letter of intent were largely identical to those set forth in the Philco letter of intent, but with Selig in the place of Anubis and taking on the responsibility to fund 50% of the total cost of Downslope. The letter did not, however, give Selig some portions of the compensation Anubis was to receive from Philco pursuant to the Philco letter of intent.

The next day, January 28, although Selig had not executed the letter of intent, Brownlee emailed Selig and told her that she could send the Downslope script to her industry contacts. Brownlee made no mention of keeping the script confidential. Brownlee also told Selig he had not yet given any of her information to Philco, but that Philco was "open to our team financing the entire project" and he would set up a call with the "whole team" when she was ready. Selig asked if she could contact

the agent for Joaquin Phoenix, and Brownlee responded that she should "stay away from agents until we are able to come to an agreement . . . in principle . . . then we can hit it hard and get the deal packaged!" (Ellipses in original.) Brownlee also sent Selig a list of twenty well-known actors, including Ryan Gosling, Brad Pitt, Robert Downey, Jr., and Ryan Reynolds, who he believed might be interested in the project stating "Confidentially . . . and in no particular order . . . [] I think we can get any one of these guys based on the script and the Kubrick 'last script' buzz." (Ellipses in original.) Selig then forwarded the Downslope script to her contacts at Film Nation and Voltage. The email began with "[s]ending this one to you confidentially" and went on to say that she and Anubis were "on the hunt for a sales company and to complete the funding for [the film]."

Later that evening, Brownlee emailed Philco stating Anubis had "a great call with one of our financial and producing partners regarding 'Downslope'" and the partner had "expressed strong interest in financing the entire project." Brownlee also stated that Anubis had a "signed NDA with this group." Although Brownlee had already told Selig she could speak with her contacts, he requested permission from Philco to "reach out to some of our strategic distribution and sales partners" including "Exclusive, Film Nation, and potentially Voltage." Brownlee went on to state, "We noticed that we do not have a mutual NDA between our groups and, as a matter of course, have attached [one] for your execution. We are then happy to share our partner's information and set up that call. If you would also not share the project

–8–

with any other potential financing partners until further notice, it would be appreciated." The Philco NDA was nearly identical to the one signed by Selig.

On January 30, Selig emailed Brownlee asking if she could contact another individual with whom she frequently partnered on funding things. Selig stated, "Also I want to be clear about how this works if I help you get the money or fund it myself. I don't want to get into a situation where I pull off a little miracle and get left in the dust. Has happened before. It's not fun."

Shortly thereafter, Cohen sent Selig a copy of Anubis's letter of intent with Philco. Selig responded, "This is your letter to them. Did they counter sign? Just want to make sure you really have this buttoned up and that if I help you raise the capital on this that I am attached as a producer with fees pari [passu] to you."[2] Selig testified that the Philco letter of intent did not indicate to her that Anubis had an "executed exclusive" with Philco as had been represented, but only a preliminary arrangement to fund half of the film's production budget. She also did not view the letter as an enforceable financing agreement. Selig stated she then sought to make contact directly with Philco through her industry contacts with the Downslope director, Jay Russell.

On January 31, Russell introduced Selig to Lanning and Hobbs via email. Selig told them she was excited about the project and would love to help them get it

---

[2] "Pari passu" is a Latin phrase meaning at the same rate or on equal footing.

funded. This email was followed by a phone conversation and a request by Selig to meet with the men when she was in Europe in February.

Selig then emailed Brownlee stating that she had talked with Lanning and Hobbs and she was "going to get this funded." Brownlee responded, "Let's get you officially attached and then we can set some stakes in the ground and get this done!" Selig said she could meet with Anubis on February 14 when she returned from Europe and she wanted to discuss how funding the project would be structured.

Cohen then emailed Lanning asking him to sign the NDA he had sent earlier and proposed having "an introductory call" with Selig "with the intent that we begin the drafting of a short form agreement shortly thereafter." Brownlee also sent an email to Philco and Selig stating, "We are glad to have our partner, Lauren Selig and her Shake and Bake productions excited to be a part of this project. Let us all get on a call on [February 3] and speak and set out some parameters and milestones ahead of us in order to act as one unified team."

Before the February 3 conference call, Brownlee emailed Selig's attorney, Matthew Hooper, stating Anubis was "happy to include Lauren as an equal partner in our current overall Anubis deal with Philco. Once we have an executed agreement, we will go back to Philco and get approvals on requested credits. I suggest a time/term for Lauren to line up the financing or a clause which states that the terms of her attachment and remuneration are subject to the performance and closing of the $21MM in financing for 'Downslope.'"

Following the call, Selig emailed Lanning and Hobbs stating she would circle back with them after talking to Brownlee and asked again if they were available to meet while she was in Europe. Lanning responded that Hobbs would be in London when she was there and that he might be able to join them. Lanning further commented, "Those calls are funny. Until Anubis prove [sic] their half they control nothing really." Selig relied, "Yes very funny. They pretend to be something they are not."

Later that evening, Selig emailed Lanning and Hobbs asking about proof that the Downslope script was "authentically Kubrick." Lanning responded that they had "a budgeted $2.2 mill fee payable directly to the Kubrick trust guaranteeing its pedigree. With an accompanying 60 page chain of title." Lanning followed this with an email to Brownlee stating, "We will happily provide [chain of title] . . . when we in turn receive more proof of funds\Financing." Brownlee forwarded the email to Selig and told her she could see the chain of title "[w]hen we show [proof of funds] or commit to the financing. I would suggest that we get our internal deal signed and then we can make the [chain of title] a request subsequent to executing the [short form agreement]." When Selig stated that she did not want to proceed further without seeing a chain of title, Brownlee responded that he understood "if [she] cannot continue at this point."

The next morning, after Brownlee learned of Selig's planned meeting in London with Philco and others, including Stanley Kubrick's widow, Christiane

Kubrick, Brownlee emailed Selig asking "are you okay with [t]he [chain of title] as you are now set to meet with the Kubrick family[?]" Selig forwarded the email to Lanning and Hobbs asking how they would like her to handle it. She stated,

> [Brownlee] is being rather pushy about my signing a document with them. I am not going to get into a battle on this and would be happy to help you fund this and get it cast. If they have an exclusive with you then my only way to get involved would be to go through them. If not we need to figure out another way. And I am not interested in doing a meeting with christian[e] kubrick and anubis at the same time as I have not signed anything yet.

When Brownlee did not receive a response from Selig about the meeting in London, he emailed Hooper, telling him, "We have arranged for Lauren to meet with the Kubrick estate in London . . . Can you give us timing on the Anubis/Selig document so we can manage expectations on all sides?"

On the morning of February 5, Selig forwarded the Downslope script to another industry contact along with information about the project obtained from Russell that was forwarded to her by Lanning. The email stated, "I have the opportunity to produce with a company called Philco out of the UK that is the family rights holder. Ccd above. . . . As I mentioned, Glen at Film nation, nick at voltage and exclusive are the only sales companies that have it so far as they were pre-approved by philco." Selig then stated she would be meeting with Christianne Kubrick in one week and asked for help with casting and funding.

Later that day, Lanning sent an email to Brownlee stating that Philco had other financiers "willing to go to the next stage with proof of funds via their bankers" and

asked if Anubis was able to respond accordingly. Lanning further stated that, "So I am able to deal sensibly with these potential other funders which is dependent on Anubis creating a new offer for 100% of the finance, I would like you to confirm in writing that Lauren Selig is signed to partner you in this new arrangement as you indicated on our recent telephone conversation." Lanning forwarded the email to Selig and told her he would send her Anubis's response. Selig responded that Brownlee had been trying to call her all morning, but she was "not going to sign his deal right now. He deserves a finder's fee, but I don't want to be tied to him through this process and I don't like his way of making up stories. That doesn't work for me." Lanning agreed and noted that Philco would save additional fees if it did not contract with Anubis directly.

Brownlee responded to Lanning's email stating, "As I mentioned on the phone yesterday, we are completing internal documentation between Lauren and Anubis and we will get written confirmation to you once this is executed. In anticipation of that, we will be sending an adjusted LOI which allows for Anubis to finance 100% of "The Downslope" and additional credits to include Lauren and her company." Lanning replied that he did not "need another LOI in anticipation of the Lauren/Anubis Deal. As obviously your deal with her is not finalized yet. More important to us is the question of you providing proof of funds now to accommodate other contacts." Brownlee replied that Anubis's funding was not contingent upon Selig's involvement and they were prepared to speak to Philco's other potential

investors once Philco had "signed agreements with them under the same terms as our executed agreement."

At the same time, Brownlee emailed Selig asking, "Are you still wanting to proceed with "The Downslope?" If you could give us an update, it would be appreciated. If so, we should put Matt [Hooper] in touch with our counsel, Larry Waks, to complete our agreement."

Nineteen days later, on February 24, when Philco had not received proof of funds from Anubis, Lanning sent an email entitled "Termination of Arrangement to Fund 'The Downslope.'" In the email Lanning stated,

> It is with regret that Philco today is terminating its relationship with Anubis to part fund "The Downslope." Your lack of contact has really unsettled us as well as putting doubt in Philco's ability to perform with some of its other potential financial sources. We have been waiting since February 5th for you to come back to us with some answers or even to make any contact at all. I personally called on the 6th and 7th leaving messages on your message service. You also never made any further contact with our Director who made time to meet up with you when you were planning your recent LA visit. We will naturally not discuss with anyone our reasons for ending this arrangement and wish you great success with all your other projects.

Despite this email, four months later, on June 29, Brownlee emailed Selig regarding their "mutual project, Downslope" and stated Anubis had become aware that she was pursuing the opportunity directly with Philco. Brownlee stated he "found this very disturbing as all parties are aware of our exclusive in this film project." Brownlee referenced the non-disclosure agreement Selig signed in November 2013 and the fact that Anubis had later sent her the Downslope script in

January 2014. Brownlee then stated that, "As requested, we sent Matthew [Hooper] our executed agreement with Philco as well as a draft Term Sheet (January 27, 2014) for your/Shake and Bake's involvement in our project, "Downslope."" According to the email, Anubis made repeated attempts over the following weeks "to get the Anubis/Shake and Bake Term sheet completed and executed." Brownlee advised Selig that "if it is your, or anyone whom you introduced this project too [sic], intention to proceed at any level with this project, we request that you immediately comp[l]ete and execute our agreement as originally intended."

Hooper responded that Anubis had misrepresented its relationship with Selig to Philco and Anubis's inability to participate in the project was due to its own "complacency and poor communication." The email concluded by demanding that Anubis cease and desist from stating that "Anubis in any way represents Ms. Selig in any transaction" or from interfering in Selig's current or prospective agreements and business relationships.

Anubis filed this action in December 2017 asserting claims against Selig, Lanning, and Hobbs for, among other things, breach of the Selig NDA, breaches of the letters of intent, quantum meruit, promissory estoppel, fraud, and breach of fiduciary duty. Lanning and Hobbs filed a special appearance contending the trial court lacked either general or specific jurisdiction over them. Selig filed two motions for summary judgment.

Following separate hearings and in separate orders, the trial court granted summary judgment in favor of Selig, first on Anubis's contract claims, and later on its claims for quantum meruit, promissory estoppel, fraud, and breach of fiduciary duty. On the same day the court granted Selig's second summary judgment, it signed an order granting Lanning and Hobbs's special appearance and dismissed the suit against them.

Thirty days after Anubis's claims were dismissed, Selig filed a motion for sanctions against Anubis and its counsel contending the claims against her were baseless as shown by Anubis's own documents and the suit was brought solely for the purpose of harassment. Anubis responded that Selig failed to identify any proper basis for an award of sanctions and the motion was "nothing more than an effort to convert summary judgment practice into a fee-shifting mechanism." The trial court denied Selig's motion and she and Anubis filed these cross-appeals.

## Analysis

## Summary Judgment

## I. Breach of Contract Claims

In its appeal, Anubis first challenges the trial court's summary judgment dismissing its claims against Selig for breach of contract. Selig moved for summary judgment on the contract claims asserting several grounds including that the evidence conclusively established (1) her nondisclosure agreement with Anubis did not restrict the information Anubis provided her regarding the Downslope project

and (2) the unsigned letter of intent was not binding on her. We review an order granting a motion for summary judgment de novo. *Lujan v. Navistar*, 555 S.W.3d 79, 84 (Tex. 2018). To be entitled to summary judgment, the movant must show no genuine issues of material fact exist and they are entitled to judgment as a matter of law. *Id*. We first address Anubis claims against Selig based on the non-disclosure agreement.

## A. The Nondisclosure Agreement

Anubis contends the trial court erred in granting summary judgment on its claims under the NDA because the agreement applied to the Downslope project and there were fact issues regarding whether Selig misused confidential information Anubis had given her.[3] According to Anubis, the allegedly confidential information it provided Selig included the Downslope script and information about casting, budget, sales estimates, and staffing. The NDA between Anubis and Selig required that, for written material to be considered confidential, it must be marked confidential on its face. Excluded from the agreement was any information that was (1) publically known at the time it was disclosed, (2) approved for release by the disclosing party, or (3) rightfully received from a third party without restriction on disclosure. Absent a compelling reason, courts must respect and enforce the terms

---

[3] As an alternate ground for summary judgment, Selig asserted that the NDA applied only to the Mantivities project. For purposes of this opinion, we assume the NDA applied to the Downslope project as urged by Anubis.

of the contract the parties have freely and voluntarily made. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019).

It is undisputed that the Downslope script was not marked confidential and, when Brownlee first shared it with Selig, he simply sent her a link to the script without any indication that it was confidential. In a later email discussing the film's director and possible cast members, Brownlee simply stated, "Please do not forward the script." This email was followed a short time later by an email in which Brownlee discussed the film's budget and the fact that the filming location was being moved from Romania to Texas. Like the script, these emails were not marked as confidential and thus would not meet the agreement's definition of confidential information. Only one email contained the word "confidentially" and the substance of that email was not information, but rather speculation by Brownlee about twenty popular actors he thought might be interested in the Downslope project.

It is also undisputed that the Kubrick estate is the rights holder to both the Downslope script and the project. Lanning testified Philco became authorized to represent the Kubrick estate in connection with the Downslope project in 2009 and, since that time, Philco had shared the script with "many persons and entities . . . who were interested in developing the script into a movie." Lanning further testified that, on behalf of Philco, he "shared with Lauren Selig the script for Downslope and various other materials relevant to the Downslope project." Although Anubis argues

–18–

Philco restricted Selig's ability to disclose the script, thereby making it confidential under the terms of the NDA, Anubis cites no evidence to support this assertion.[4]

Anubis contends that, even if the materials it disclosed to Selig were not initially covered by the agreement, there is a fact issue regarding whether the parties considered the information confidential because Selig treated it as such when she asked for Anubis's permission to send the Downslope script and information about the project to some of her contacts. This argument begs the question of how Selig could have breached the NDA if she treated the information given to her as confidential in the manner prescribed by the agreement.

The summary judgment evidence contains three disclosures by Selig of information about the Downslope project. The first two disclosures occurred on January 28, 2014, and were authorized by Anubis in writing, thus removing the information from the definition of confidential information under the terms of the agreement. The third disclosure occurred on February 5 and was specifically

---

[4] Although Anubis provides a record citation to support this argument, the page Anubis cites is a court reporter's certification. Immediately preceding this page is deposition testimony by Selig in which she stated that it would be her "preference that the Downslope script isn't shared to the greater public." Anubis does not explain how this statement can be read to suggest that Philco restricted Selig's use of the script. Alternatively, on the pages following the court reporter's certification are emails between Selig and Lanning. In these emails Selig requested Philco's permission to reach out to other contacts to "package" with her on the project. The emails do not contain any reference to restrictions on Selig's use or disclosure of information, nor can any such restriction be inferred. Lanning's response to Selig's request was simply "Yes," with no mention of any restrictions on the information Selig could provide her contacts. The email Selig then sent to one of her contacts, and on which both Lanning and Hobbs were copied, included the Downslope script and information about the budget, production, and casting with no mention of confidentiality.

authorized by Philco. This disclosure included the script, to which Philco had the exclusive rights from the Kubrick estate, and information from the film's producer given to Selig by Lanning, not Anubis.[5]

Anubis contends that, under the terms of the NDA, Selig was permitted to use the information it gave her about Downslope only for the purpose of participating in discussions with Anubis. Accordingly, it argues that her working directly with Philco constituted a violation of the agreement and any information she received from Philco was not "rightfully received." In making this argument, Anubis attempts to bootstrap its claim that Selig violated the NDA to its claim that she breached the unsigned letter of intent. The NDA states that neither party is obligated to proceed with any transaction until both parties sign a formal, written agreement setting forth the terms of the transaction. The NDA further states that, at any time prior to the completion of such a formal, written agreement, Selig was free to terminate her discussions with Anubis. Nothing in the NDA prevented Selig from choosing not to proceed with Anubis and to work with directly with Philco.

---

[5] Lanning testified he gave Selig a copy of the script in February 2014. Anubis argues the evidence suggests this did not occur until after Selig sent the script to her contact on February 5. Because of this, Anubis contends Selig must have sent the copy it received from Anubis which was covered by the agreement and required Anubis's authorization. Even assuming the script could be considered confidential information, it is undisputed that Anubis received its copy of the script from Philco and that Philco authorized Selig to disclose the script to her contact on February 5. Brownlee in fact testified that he requested Philco's permission to share the script when he authorized Selig to make the January 28 disclosures. Whether the copy of the script Selig sent her contact on February 5 was given to her by Anubis or Philco is a distinction that makes no difference.

Nor does the NDA prevent Selig from using information she obtained from Anubis once she obtained the same information from Philco. In fact, the agreement excludes such information from coverage. While Selig may not have been aware of the opportunity to work with Philco prior to Anubis discussing the project with her, the opportunity itself was not confidential information and Anubis makes no argument to show that it was.[6] Although the agreement prevents Selig from disclosing to Philco any confidential information she obtained from Anubis of which Philco was unaware, there is no evidence in the record that this occurred. The evidence shows instead that Selig's discussions with Philco involved information provided by, and originating from, sources unrelated to Anubis and given to Selig by Philco. Accordingly, we conclude the trial court properly granted summary judgment on Anubis's claim for breach of the NDA.

## B. The Letter of Intent

Selig moved for summary judgment on Anubis's claim for breach of the letter of intent contending the evidence conclusively showed no enforceable transactional contract was ever formed. Anubis concedes that Selig never signed the letter of intent, but argues there is a fact issue regarding whether an enforceable oral

---

[6] Selig provided summary judgment evidence showing that the production of the Downslope script and Philco's involvement with the project was publically known for years before Anubis became involved. Although Anubis objected to this evidence, the trial court overruled these objections and, other than noting the objection, Anubis presents no argument or authority on appeal challenging the trial court's ruling.

agreement was created. We conclude the summary judgment evidence shows no enforceable contract was formed as a matter of law.

To prove the formation of a valid and enforceable contract, Anubis is required to establish that (1) an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract; (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding. *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018). In addition, a party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied. *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 673 (Tex. 2020). Parties may agree that a formal, written agreement signed by the parties is a condition precedent to contract formation. *Id*.

The elements of oral contracts are the same as for written contracts and must be present for a contract to be binding. *Thornton v. Dobbs*, 355 S.W.3d 312, 316 (Tex. App.—Dallas 2011, no pet.). In determining whether an oral contract exists, we examine the communications between the parties and the circumstances surrounding those communications. *Id*. Although whether parties have formed a contract to which they intend to be bound is often a question of fact, it may be resolved by the court as a matter of law. *See Chalker*, 595 S.W.3d at 673.

In this case, the only contract signed by both parties was the NDA. In that contract, Anubis and Selig agreed that neither party was "bound to proceed with any transaction between them unless and until both parties signed a formal, written agreement setting forth the terms of such transaction." The Texas Supreme Court recently addressed the effect of a substantially similar "no obligation" provision in *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*. *Id*.

In *Chalker*, the parties signed a "Confidentiality Agreement" that included a "no obligation" provision stating "unless and until a definitive agreement has been executed and delivered, no contract or agreement providing for a transaction between the Parties shall be deemed to exist." *Id*. The supreme court began its analysis of the effect of this provision by stressing that "Texas's strong public policy favoring freedom of contract is firmly embedded in our jurisprudence." *Id*. The court went on to conclude that language such as that found in the "no obligation" clause "makes clear the parties' intent that the contemplated formal document is a condition precedent to contract formation." *Id* at 674. Because no contract was "executed and delivered" by the parties as required by the confidentiality agreement, the court concluded no binding transactional contract was created as a matter of law. *Id*.

The language in the NDA before us is substantively identical to the language presented in *Chalker*. The "No Obligation to Complete Transaction" provision of the NDA drafted by Anubis required the parties to sign a formal, written agreement

–23–

setting out the terms of the transaction before the parties became contractually bound. Because Selig never signed a written agreement with Anubis, the agreed upon condition precedent to the formation of a transactional contract was never fulfilled and no binding contract was created. *Id.*

Like the plaintiff in *Chalker*, Anubis argues Selig waived the requirement of an executed written contract by her conduct. Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Id.* at 676. Although waiver is ordinarily a fact question, when the surrounding facts and circumstances are undisputed, waiver may be decided as a matter of law. *Id.* at 676–77. To establish waiver by conduct, Anubis was required to show that Selig acted in a manner that was "unequivocally inconsistent" with relying on her right to not be bound until she signed a formal, written agreement. *See id.* at 677.

The evidence Anubis relies upon to show waiver is largely affidavit testimony by Brownlee. In his affidavit, Brownlee stated that, on January 27, 2014, he spoke with Selig on the phone and "Anubis understood that agreement had been reached." Brownlee further testified that "Selig requested that the terms be memorialized in writing" and "at Ms. Selig's direction, Anubis sent Ms. Selig a letter of intent . . . memorializing those terms and requested her signature so that 'we can move forward.'"

Rather than demonstrating waiver, this testimony confirms that Selig was relying on the need for a signed, written agreement before she would be contractually

bound to proceed with any transaction with Anubis. Brownlee's testimony concerning his understanding of the conversation with Selig is insufficient on its own to create a fact issue. An interested witnesses' affidavit testimony reciting that he believes certain facts to be true is not readily controvertible and has no probative value. *Doe I v. Ripley Entm't, Inc.*, No. 05-18-00470-CV, 2020 WL 57339, at *3 (Tex. App.—Dallas Jan. 6, 2020, no pet.) (mem. op.). Brownlee's self-serving statement that he believed an oral agreement had been reached, without any underlying factual support, will not raise a fact issue to defeat summary judgment. *Id.*

The absence of underlying facts to support Brownlee's testimony is made apparent by the abundant evidence showing that neither Selig nor Anubis conducted themselves in a manner suggesting an enforceable transactional agreement between them had been reached. Anubis points to the emails Selig sent to her industry contacts stating that she and Anubis were "on the hunt" for funding for the Downslope project as evidence that Selig believed the parties had finalized an agreement to work together. But the NDA drafted by Anubis contemplated the parties would "perform[] work or incur[] expenses related to a potential transaction in anticipation that the parties would enter into a formal, written agreement regarding such transaction." It was agreed that such work would be performed without either party being liable to the other if they chose not to go forward with the transaction before a formal agreement was signed. Performing work related to the potential

–25–

transaction does not, therefore, demonstrate Selig believed a binding transactional agreement between the parties existed or that she intended to waive the requirement of a formal, written contract signed by both parties. All other communications between Selig and Anubis are consistent with Selig's assertion that no enforceable agreement had been created.

Immediately before Selig sent the emails to her contacts stating that she and Anubis were "on the hunt" for funding, Brownlee told her that she could not contact the agent for one of the proposed actors because they had not yet "come to an agreement [] in principle." Later that same day, Brownlee told Philco that Anubis had a signed NDA with Selig, but made no mention of any transactional agreement.

Two days later, after Selig received a copy of the letter of intent between Philco and Anubis, Selig expressed concern to Brownlee that "*if*" she helped Anubis raise capital for Downslope, she wanted to make sure she was "attached as a producer with fees pari [passu]to [Anubis]." Contrary to Selig's stated requirement, the letter of intent drafted by Anubis did not grant her the same compensation that Anubis was to receive. Accordingly, the letter of intent upon which Anubis relies did not reflect the deal Selig stated she wanted.

Over the next several days, Anubis repeatedly requested that Selig sign the letter of intent so that she would be "officially attached." Brownlee stated Anubis could not get approvals on producer credits for Selig until she and Anubis had "an executed agreement." Additionally, Brownlee sent an email to Selig's attorney

suggesting that a clause be added to the agreement stating the terms of her attachment and remuneration would be subject to her performance in obtaining financing. It is clear from this, that the terms of a transactional agreement between Anubis and Selig were still being negotiated.

Finally, on two different occasions, Brownlee indicated Selig was free to discontinue her involvement with Downslope. When Selig told Brownlee she did not want to continue exploring funding without a chain of title guaranteeing authenticity of the script, Brownlee responded that he understood if she chose not to continue with the project at that point. Brownlee later asked Selig if she was "still wanting to proceed with 'The Downslope?'" All communications between Selig and Anubis clearly demonstrate Selig did nothing unequivocally inconsistent with her right to insist upon a formal, written agreement signed by both parties. We conclude the trial court properly granted summary judgment on Anubis's claim for breach of the letter of intent. *See Chalker*, 595 S.W.3d at 677.

## II. Quantum Meruit

As an alternative to its contract claims, Anubis additionally sought to recover from Selig under a quantum meruit theory. Anubis asserts that Selig's email to Lanning in which she suggested Anubis was entitled to a "finder's fee" for bringing the parties together was "legally sufficient evidence that Anubis provided her with valuable services or materials." We disagree.

Quantum meruit is an equitable remedy based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted. *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018). To recover under quantum-meruit, the claimant must prove that: (1) valuable services were rendered or materials furnished; (2) to the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by her; and (4) the person sought to be charged was reasonably notified that the claimant performing such services or furnishing such materials was expecting to be paid by the person sought to be charged. *Id.* at 732–33. A party generally cannot recover under a quantum meruit claim when there is a valid contract covering the services or materials furnished. *Id.* at 733.[7]

Anubis contends that it expected compensation for introducing Selig to Philco. To succeed on its claim, however, Anubis was required to show that it

---

[7] In her first motion for summary judgment, Selig contended that any services or materials furnished to her by Anubis were covered by the NDA, which specifically prohibited recovery for work performed or expenses incurred related to a potential transaction if the parties did not enter into a formal, written transactional agreement. After a hearing on Selig's motion, the trial court granted summary judgment against Anubis on its contract claims, but reserved judgment on the remaining claims, including the quantum meruit claim, until after further discovery was conducted. Sometime later, Selig filed a second motion for summary judgment on Anubis's remaining claims. In this motion, Selig did not reassert her argument that the NDA contractually barred Anubis's claim for quantum meruit. Nor did she incorporate her prior motion for summary judgment by reference. In its order granting summary judgment in favor of Selig on Anubis's claims for quantum meruit, breach of fiduciary duty, fraud, and promissory estoppel, the trial court stated it considered only Selig's second motion for summary judgment. Accordingly, our review is limited to the grounds presented in that motion.

expected compensation *from Selig* for introducing her to Philco. *Id*.[8] The evidence presented by Anubis showed that it cultivated a relationship with Selig in the hope that she would agree to provide financing to Philco. If the deal was consummated, both Anubis and Selig would receive compensation from Philco. Anubis presented no evidence that there was ever any contemplation that Selig would compensate Anubis for anything. *See Peko Oil USA v. Evans*, 800 S.W.2d 572, 576 (Tex. App.— Dallas 1990, writ denied) (quantum meruit claim fails absent evidence of expectation of payment from defendant).

Even the gratuitous "finder's fee" statement made by Selig, and relied upon by Anubis, cannot support Anubis's claim. First, Selig was brought in by Anubis for the benefit of itself and Philco. As the "found" party, Selig would not be the one obligated to pay the fee. More importantly, Anubis's alleged contract with Philco stated that Anubis was to provide funding for the Downslope project, not find other parties who would provide funding.[9] Anubis provided no evidence that either Selig or Philco expected or agreed at the time the introduction was made that Anubis would be paid a finder's fee for its introduction of Selig to Philco. *See id*. (court will

---

[8] Anubis contends that Selig's second motion for summary judgment challenged only the first two elements of its quantum meruit claim. We do not read Selig's motion so narrowly. In her motion, Selig clearly argued that Anubis could not show it expected payment from her for any services it rendered.

[9] Anubis contends that its due-diligence letter with SCTVA contemplated Anubis could arrange financing for Downslope with "one or more lenders." This letter, by its terms, (1) was between only Anubis and SCTVA, (2) specified SCTVA as the recipient of funds raised by Anubis, and (3) "imposed no liability or obligation on Anubis in any way." Selig was not a recipient of this letter and there is no evidence she was ever aware of it. Anubis does not explain how this letter concerning a potential loan that never occurred between two unrelated entities could create an implied obligation owed by Selig.

–29–

not fabricate promise implied by law for cash payment parties neither expected nor agreed upon).

Finally, it is elementary in the law governing quantum meruit that no recovery can be had for preliminary services that are performed with a view to obtaining business through a hoped-for contract. *Id*. at 577. "Where preliminary services are conferred for business reasons, without the anticipation that reimbursement will *directly* result, but rather, with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations relating thereto, quasi-contractual relief is unwarranted." *Id*. Quantum meruit relief may not be obtained where the claimant did not contemplate compensation at the time the services were rendered or the defendant could not have reasonably believed the plaintiff expected compensation. *Id*. at 577–78.

Anubis relies on the Texas Supreme Court's opinion in *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942 (Tex. 1990), to argue that quantum meruit relief can be based on the expectation of a future contract. In that case, the supreme court concluded that Chevron had sufficient notice that Vortt expected to be compensated for confidential information it provided Chevron when both parties understood the information was being disclosed based on the expectation of it being used as part of a joint operating agreement. *Id*. at 945. Anubis contends it is similarly entitled to quantum meruit relief because it furnished confidential information to Selig with the expectation that she and Anubis would enter into a

transactional agreement.  As this Court has stated, however, *Vortt* was decided on the narrow issue of sufficient notice only.  *Peko*, 800 S.W.2d at 579.  *Vortt* does not alter longstanding law that no quantum meruit recovery may be obtained based on services performed with a view toward obtaining a hoped-for contract.

Unlike the facts presented in *Vortt*, Anubis has presented no evidence that Selig was reasonably notified that Anubis expected her to compensate it for the information it provided or that the information was disclosed to her based on the understanding that an agreement between them was certain to occur.  Most of the alleged confidential information was disclosed to Selig on January 10, well before any discussions about working together on the Downslope project began.  It was not until more than two weeks later that Anubis reached out to Selig to ask if she was interested in discussing the possibility of working with Anubis on Downslope.  It was at this point that Anubis disclosed the remaining information and stated "If you are interested, let us know."  At the time the information was disclosed, therefore, there was clearly no understanding between the parties that an agreement to work together was expected.  Indeed, the NDA drafted by Anubis notified Selig of the opposite – that neither party should expect a transactional agreement to necessarily occur based on the parties' discussions.  We conclude the trial court properly granted summary judgment on Anubis's claim for quantum meruit.

## III. Breach of Fiduciary Duty

In contending the trial court erred in granting summary judgment on its claim for breach of fiduciary duty, Anubis first argues that Selig failed to move for summary judgment on its claim that Selig owed it a fiduciary duty based on the parties having formed a partnership. The trial court's order granting summary judgment on Anubis's claim for breach of fiduciary duty was based on Selig's second motion for summary judgment. In that motion, Selig stressed that, even though Anubis referred to her as a partner, "she never agreed to be anyone's partner" and "[s]he never partnered with Anubis." She further stated that the letter of intent drafted by Anubis "was not even close to being a partnership agreement" and, even if it was, the agreement was never executed. In the portion of the motion specifically addressing Anubis's fiduciary duty claims, Selig summarized the history of the parties' business dealings, including the fact that she never executed the letter of intent, and argued "there is no foundation from which the court could recognize a fiduciary duty on these facts." We conclude Selig's motion sufficiently challenged Anubis's assertion that Selig had formed a partnership with Anubis giving rise to a fiduciary duty.

Anubis next argues it presented sufficient evidence to create a fact issue as to whether the parties created a partnership. Specifically, Anubis contends it presented evidence of the factors indicating the creation of a partnership under section 152.052(a) of the Texas Business Organizations Code. *See* TEX. BUS. ORGS. CODE

–32–

ANN. § 152.052(a). These factors are irrelevant, however, where the parties have agreed that no binding or enforceable obligations will be created unless certain conditions are met. *See Energy Transfer Partners, L.P. v. Enter. Prods. Partners, L.P.*, 593 S.W.3d 732, 741 (Tex. 2020). Such an agreement to not be bound absent the specified conditions is ordinarily conclusive on the issue of partnership formation. *Id*.

In this case, Selig and Anubis agreed they were not obligated to work together on any transaction unless both parties signed a formal, written transactional contract. It is undisputed that this did not occur. Although performance of a condition precedent to forming a partnership can be waived, in determining whether such waiver has occurred, we consider only evidence directly tied to the condition precedent, and not the factors relevant to partnership creation set out in section 152.052(a). *Id*. As discussed above, the evidence conclusively shows Selig did not waive her right to require a signed contract before being obligated to work with Anubis. Accordingly, Selig negated the creation of a partnership as a matter of law. *See id*. Anubis asserts no other basis upon which Selig would owe a fiduciary duty to Anubis. Accordingly, we conclude the trial court properly granted summary judgment in favor of Selig on this claim.

## IV. Fraud and Promissory Estoppel

In its final challenge to the summary judgment, Anubis argues the trial court erred in dismissing its claims for fraud and promissory estoppel because it presented

evidence that Anubis forewent searching for other potential funding partners based on alleged misrepresentations made by Selig. The statements Anubis contends it relied upon were: (1) Selig's request for permission to send the Downslope script to her industry contacts; (2) Selig's emails to her contacts stating that she and Anubis were "on the hunt" for funding; (3) Selig's email expressing concern that she not "get left in the dust" if she helped Anubis find funding or funded the movie herself; (4) Selig's email stating that, if she helped Anubis raise capital, she expected compensation equal to that being received by Anubis; and (5) Selig's emails stating that, after meeting independently with Russell, Lanning, and Hobbs, she was going to "get this funded" and she was willing to meet with Anubis to "talk about how this gets structured." Anubis argues that Selig's "expressed enthusiasm for partnering on the project" induced it to "not solicit other funding sources to which it had access."

A central element to both fraud and promissory estoppel is detrimental reliance. *Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 558 (Tex. App.—San Antonio 1998, no pet.). To support recovery, such reliance must be both reasonable and justified. *Id*. Reliance is justified only when a promise is sufficiently specific and definite that it is reasonable to rely on it as a commitment to future action. *Davis v. Tx. Farm Bureau Ins.*, 470 S.W.3d 97, 108 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Neither statements of hope nor expressions of expectations can support reasonable reliance. *Esty v. Beal Bank, S.S.B.*, 298 S.W.3d 280, 305 (Tex. App.—

Dallas 2009, no pet.). We will not create a contract based on estoppel where none existed before. *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 570 (Tex. App.— Dallas 1989, no pet.).

None of the statements Anubis points to constitutes a specific and definite promise by Selig to partner with Anubis. Even taken together, they demonstrate nothing more than engagement in the discussions referred to in the NDA that could potentially lead to a signed transactional contract. "Expressed enthusiasm" cannot take the place of a specific and definite promise upon which Anubis could have justifiably relied. *See Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 503 (Tex. 1998) (only definite promises, not vague assurances, can support justifiable reliance); *see also Hui Ye v. Xiang Zhang*, No. 4:18-cv-4729, 2020 WL 2521292, at *6–7 (S.D. Tex. May 15, 2020). This is particularly true given the NDA's provision that either party could opt out of going forward with the transaction at any point prior to signing a transactional agreement even if the other party took actions in anticipation that a written transactional agreement would occur. *Cf. Davis*, 470 S.W.3d at 109 (plaintiff could not justifiably rely on unaccepted settlement offer that could be withdrawn at any time as basis for not filing action before limitations period expired). Anubis's choice to not solicit other funding partners was made at its own peril. *Id.*

In addition, it must be noted that Anubis was brought in as an investor in the Downslope project in October 2013, but did not begin talking to Selig until January

–35–

2014. It was not until January 27 that Brownlee began actual discussions with Selig about Downslope and suggested that the parties enter into a transactional contract. On February 3, Brownlee stated that he understood if Selig did not want to continue with the project and, on February 5, Brownlee asked Selig if she was still interested in working with them. After sending that inquiry, Brownlee informed Philco that Anubis's agreement to fund Downslope was "not contingent on [Selig's] involvement." The record contains no communications between Anubis and Selig after February 5. Three weeks later, Philco terminated its relationship with Anubis for failure to provide proof that it could supply the promised funds. Therefore, of the almost five months Anubis was involved in the Downslope project, it was in discussions with Selig for only slightly more than one week. The content of those discussions clearly presumes that Selig might not go forward with the project. We conclude Selig established there was no reasonable or justifiable reliance by Anubis as a matter of law and the trial court properly granted summary judgment on Anubis's claims for fraud and promissory estoppel.

**Special Appearance**

In its second issue, Anubis contends the trial court erred in granting the special appearance filed by Lanning and Hobbs and dismissing its claims against them for lack of jurisdiction. Anubis's first amended petition alleged the trial court had personal jurisdiction over Lanning and Hobbs because they (1) made misrepresentations regarding Philco's rights and interests in Downslope, (2) worked

–36–

with Anubis in connection with the Downslope project, in part, because of Anubis's presence in Texas, (3) agreed to shoot the film at a Texas location through a Texas-based studio in Dallas County and prepared budgets detailing a Texas-focused production, and (4) made intentional misrepresentations to Anubis in Texas with the intent that Anubis rely on them. Anubis further alleged that, even if the actions at issue were conducted by Lanning and Hobbs as agents for Philco, all of Philco's contacts could be attributed to Lanning and Hobbs because Philco was their alter ego and the men used Philco to perpetrate a fraud in Texas. Anubis sought a declaratory judgment on its alter ego allegation and asserted claims against Lanning and Hobbs for unjust enrichment, breach of the letter of intent, fraud, and fraudulent transfer.

Lanning and Hobbs filed a special appearance, supported by affidavits, contending they had insufficient contacts with Texas to support either general or specific jurisdiction of the trial court over them and Anubis had no evidence to support its jurisdictional allegations. On appeal, Anubis does not contend the trial court had general jurisdiction over Lanning or Hobbs. It contends only that the trial court had specific jurisdiction based on Philco's business dealings with Anubis, including the NDA and letter of intent, which were attributable to Lanning and Hobbs based on an alter ego theory of liability. Anubis further asserts Lanning and Hobbs are independently liable for their own fraudulent and tortious acts.

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549

S.W.3d 550, 558 (Tex. 2018). To resolve this question, however, the trial court frequently must resolve preliminary questions of fact. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If, as here, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all findings of fact necessary to support the ruling that are supported by the evidence are implied. *Id.* at 795. When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency on appeal. *Id.* Where jurisdictional facts are undisputed, we need not consider any implied findings of fact and consider only the legal question whether the undisputed facts establish jurisdiction. *Old Republic*, 549 S.W.3d at 558.

Anubis does not dispute that the alleged agreements and business dealings made the basis of its claims against Lanning and Hobbs were between Anubis and Philco. Anubis asserts that Philco's contacts with Texas were sufficient to give rise to specific jurisdiction and are attributable to Lanning and Hobbs on an alter ego theory of liability. Even assuming Philco's contacts were sufficient to subject it to jurisdiction in this state, we conclude Anubis failed to meet its burden to show an alter ego relationship.

"Jurisdiction over an individual cannot, as a general rule, be based upon jurisdiction over a corporation." *Wilmington Trust, Nat'l Ass'n v. Hsin-Chi-Su*, 573 S.W.3d 845, 855 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The party

seeking to pierce the corporate veil for jurisdictional purposes has the burden to present evidence demonstrating the alter ego relationship. *BMC Software* 83 S.W.3d at 798. An individual's status as an officer, director, or shareholder of an entity, standing alone, is not enough to support an alter ego finding. *Wilmington Trust*, 573 S.W.3d at 855. The plaintiff must prove the individual exercises atypical control over the internal business operations and affairs of the corporation that is inconsistent with his role as owner, director, or shareholder. *Id*. Factors relevant to the determination of an alter ego relationship for jurisdictional purposes include the degree to which corporate and individual property have been kept separate, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Id*. Ultimately, for a court to find personal jurisdiction under an alter ego theory, the evidence in the record must show that the individual and the entity cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *BMC Software,* 83 S.W.3d at 799. A conclusory allegation that a nonresident defendant used a corporation "as a sham to perpetrate fraud" is insufficient to pierce the veil for jurisdictional purposes where the plaintiff does not plead or otherwise offer evidence of any facts to establish how a defendant allegedly used the corporation to perpetrate fraud. *Booth v. Kontomitras*, 485 S.W.3d 461, 483 (Tex. App.—Beaumont 2016, no pet.).

The primary evidence submitted by Anubis on the alter ego issue was deposition testimony by Lanning about a company formed by one of his sons to produce films called ForLan Underground. ForLan Underground was originally named Philco Film Productions, Ltd. ("PFP") and, from March 24, 2015 to February 14, 2018, PFP had no employees and no bank account. Lanning stated PFP was "literally a company name" that "remained dormant until it was required to do something for my son." When asked why the company was given a name similar to Philco's, Lanning responded that "the hope was that we would be successful in the same way as one hoped that Philco Films, Limited would be successful." Lanning continued by stating "the opposite" occurred and "[i]t was a dormant company that, in the end, didn't function."

On appeal, Anubis attempts to use this testimony as evidence that Philco was a "meaningless paper entity." None of this testimony, however, concerned Philco. It concerned only PFP. Anubis points to a reference to "Philco Film Productions, Ltd." in the 2013 contract between Philco and SCTVA as evidence of "a failure to maintain corporate separateness" between PFP and Philco. When asked about this reference, Lanning testified it was a typo and the contract shows he signed on behalf of Philco. Additionally, the record suggests that PFP was not created until 2015. Even if PFP existed in 2013, this evidence would go to show only a potential alter ego relationship between Philco and PFP, not Philco and Lanning or Hobbs.

Finally, Anubis relies on Lanning's testimony that he and Hobbs used Philco as "the vehicle" to seek financing for another Kubrick Film, and that he was authorized to represent Philco as a producer despite no longer being an officer of the company. Anubis argues that this testimony, "with no mention of corporate formalities," demonstrates an alter ego relationship. Lanning's "failure to mention" corporate formalities does not constitute proof that such formalities did not exist, particularly when the deposition evidence Anubis submitted as proof contained no questions posed to Lanning regarding corporate formalities. Nor does this testimony show that Lanning or Hobbs used Philco for personal purposes. Indeed, Anubis presented no evidence whatsoever regarding Philco's operations. We conclude Anubis failed to meet its burden to show an alter ego relationship such that Philco's alleged contacts with Texas could be attributed to Lanning and Hobbs.

This does not end our analysis, however. As Anubis correctly notes, even if all of a corporate officer's or employee's contacts were performed in a corporate capacity, the agent is not shielded from the exercise of specific jurisdiction if he engaged in tortious or fraudulent conduct for which he may be held personally liable. *Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex. App.—Dallas 2012, no pet.). In this case, Anubis asserted three claims sounding in tort against Lanning and Hobbs: unjust enrichment, fraud, and fraudulent transfer. But, as to each of these causes of action, Anubis provides little, if any, explanation as to how these claims arise from Lanning's or Hobbs's alleged contacts with Texas. For each claim, Anubis merely

states "This cause of action is related to [Anubis's] allegations concerning *The Downslope* and Lanning and Hobbs's intentional acts directed toward the forum." Specific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). Anubis makes no argument, and cites no authority, to show how the trial court had jurisdiction over its individual tort claims. When a party fails to adequately brief a complaint, the issue is waived on appeal. *Washington v. Bank of New York*, 362 S.W.3d 853, 854–55 (Tex. App.—Dallas 2012, no pet.).

Furthermore, specific jurisdiction is not established merely because a nonresident "directed a tort" at the forum state. *Michiana v. Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790–92 (Tex.2005). Nor is injury to a forum resident a sufficient connection to invoke jurisdiction. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 42 (Tex. 2016). Our analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there. *Id*. The defendant's conduct must connect him to the forum in a meaningful way. *Id*. For a Texas court to exercise specific jurisdiction over a defendant, the defendant's purposeful contacts with the state must be substantially connected to the operative facts of the litigation or form the basis of the cause of action. *Old Republic*, 549 S.W.3d at 559–60.

Anubis's unjust enrichment claim, like its quantum meruit claim against Selig, appears to be based upon the introduction of Selig to Philco. The evidence shows

that it was Anubis's choice to initiate discussions with Selig, a California resident, and it was Selig who first approached Lanning and Hobbs. That Lanning and Hobbs chose to respond to an unsolicited invitation to do business with a California resident is not conduct with a meaningful connection to the State of Texas.

In its brief, Anubis points to a single alleged misrepresentation as the basis for the trial court's jurisdiction over its fraud claim. According to Anubis, Lanning and Hobbs misrepresented that Philco had the rights to produce Downslope. Anubis's own evidence submitted in response to the special appearance included documents showing the Kubrick estate authorized Philco, Lanning, and Hobbs to "seek arrangements" for the production of Downslope. No party appears to dispute that Philco had the capacity to enter into contracts for the production of Downslope and Anubis's primary claims against Lanning and Hobbs assume that it did. Accordingly, Anubis has failed to demonstrate how this alleged "misrepresentation" is substantially connected to the operative facts of the litigation or forms the basis of a cause of action.

In its fraudulent transfer claim, Anubis alleged that, upon information and belief, Philco orchestrated the transfer of its rights in the Downslope project to PFP and this transfer was made with the intent to defraud Anubis. Anubis makes no argument to show how the alleged transfer of an asset from one European company to another, assuming it occurred, creates sufficient contact with the State of Texas to make Lanning and Hobbs subject to jurisdiction. *See Ruiz,* 490 S.W.3d at 43

(courts cannot base specific jurisdiction on fact that defendant knows brunt of injury will be felt by particular resident in forum state). Because Philco's contacts cannot be attributed to Lanning and Hobbs, and Anubis failed to show sufficient jurisdictional contacts giving rise to its tort claims against the men, we conclude the trial court did not err in granting Lanning and Hobbs's special appearance.

## Motion for Sanctions

In her cross-appeal, Selig contends the trial court abused its discretion in refusing to grant her motion for sanctions against Anubis and its counsel. Selig argues that rule 13 of the Texas Rules of Civil Procedure mandates an award of sanctions because Anubis and its counsel knew the claims asserted against her were groundless when they were filed and this suit was brought in bad faith and solely for the purpose of harassment.

Rule 13 authorizes the imposition of sanctions against an attorney, a party, or both, who filed a pleading that is: (1) groundless and brought in bad faith; or (2) groundless and brought to harass. *See* TEX. R. CIV. P. 13. Courts presume that pleadings, motions, and other papers are filed in good faith, and the party moving for sanctions has the burden of overcoming this presumption. *GTE Commc'n Sys. Corp. v. Tanner*, 856 S.W.2d 725, 731 (Tex. 1993). A pleading is "groundless" if it has no basis in law or fact and is not warranted by a good faith argument for the extension, modification, or reversal of existing law. TEX. R. CIV. P. 13; *Thielmann v. Kethan*, 371 S.W.3d 286, 294 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

"Bad faith" requires the conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose. *Stites v. Gillum*, 872 S.W.2d 786, 794–96 (Tex. App.—Fort Worth 1994, writ denied). A party acts in bad faith if he has been put on notice that his understanding of the facts may be incorrect and he does not make reasonable inquiry before pursuing the claim further. *Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied). Bad faith does not exist when a party merely exercises bad judgment or is negligent. *Thielmann*, 371 S.W.3d at 294. To "harass" means to annoy, alarm, and verbally abuse another person. *Id.*

In deciding whether a pleading was filed in bad faith or for the purpose of harassment, the trial court is required to consider the acts or omissions of the represented party or counsel, not merely the legal merit of a pleading or motion. *Parker v. Walton*, 233 S.W.3d 535, 540 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The court examines the signer's credibility, taking into consideration all the facts and circumstances available at the time of the filing, and it may consider the entire history of the case before it. *Home Owners Funding Corp. of Am. v. Scheppler*, 815 S.W.2d 884, 889 (Tex. App.—Corpus Christi–Edinburg 1991, no writ); *Great W. Drilling, Ltd. v. Alexander*, 305 S.W.3d 688, 698 (Tex. App.—Eastland 2009, no pet). Ultimately, the trial court is in the best position to determine whether sanctionable conduct has occurred and a decision not to impose sanctions generally will not be reversed for an abuse of discretion. *See Manning v. Enbridge Pipelines (East Tx.) L.P.*, 345 S.W.3d 718, 728 (Tex. App.—Beaumont 2011, pet.

denied); *Allstate Ins. Co. v. Garcia*, No. 13-02-092-CV, 2003 WL 21674766, at *2 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) (mem. op.).

Although Selig was successful in having Anubis's claims against her dismissed, she made no showing that Anubis made statements in its pleadings that it knew to be false. The parties simply had different interpretations of the legal effect of the facts. Anubis has made extensive arguments to support its positions and, while we have concluded those arguments are without merit, we do not view them as frivolous.

Selig points to an email exchange between Anubis and CMA Entertainment in July 2014 to show that the purpose of the lawsuit was solely to harass her. In the email exchange, Brownlee and Troy Allen with CMA discussed how to communicate with Selig and Philco about the Downslope Project following Philco's termination of its relationship with Anubis. Brownlee stated he thought it would be good for CMA to "weigh in officially" on the situation to show that Anubis and CMA are "communicating and acting as one party." Brownlee also stated he wanted a paper trail. In response to a question from Allen regarding whether CMA should respond to an email chain on which they had been blind copied, Brownlee responded, "I actually think you should write an entirely new email. This way they will have multiple points of contact to deal with and not just one party. Let's make this as difficult as possible for them."

Selig focuses on the last sentence in this exchange to argue that the sole purpose of this lawsuit was to make things "as difficult as possible" for her. The trial court was within its discretion, however, to conclude that Brownlee's statement did not reflect a belief that Anubis had no valid claims against Selig, but rather his belief that it did, combined with a desire to force Selig and Philco to explain their actions to multiple parties. Sanctions should only be assessed "in those egregious situations where the worst of the bar uses our honored system for ill motive without regard to reason and the guiding principles of the law." *Thielemann*, 371 S.W.3d at 295 (quoting *Dyson Descendant Corp. v. Sonat Expl. Co.*, 861 S.W.2d 942, 951 (Tex. App.—Houston [1st Dist.] 1993, no writ). Based on the record before us, we cannot conclude the trial court abused its discretion in refusing to award sanctions.

We affirm the trial court's judgments and orders.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

190817F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

ANUBIS PICTURES, LLC AND CMA FILMS, LLC, Appellants

No. 05-19-00817-CV      V.

LAUREN SELIG, SHAKE & BAKE PRODUCTIONS, STEPHEN LANNING, AND PHILIP HOBBS, Appellees

On Appeal from the 162nd Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-17-17579. Opinion delivered by Justice Reichek. Justice Pedersen, III participating.

In accordance with this Court's opinion of this date, we **AFFIRM** (1) the judgments of the trial court dismissing the claims made by ANUBIS PICTURES, LLC and CMA FILMS, LLC against LAUREN SELIG and SHAKE & BAKE PRODUCTIONS, (2) the order of the trial court granting the special appearances of STEPHEN LANNING and PHILIP HOBBS, and (3) the order of the trial court denying the motion for sanctions brought by LAUREN SELIG and SHAKE & BAKE PRODUCTIONS against ANUBIS PICTURES, LLC and its counsel.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered March 3, 2021